You're going to have to watch that time, alright, because you're splitting up time all the way Okay, thank you. We appreciate it. Good morning. May it please the Court. This is not a case of an uncooperative respondent. This is not a case of a respondent who failed to act to the best of his ability. Therefore, Congress unlawfully applied an adverse inference to NTN's rate calculation methodology. NTN fully cooperated by providing all of the information it had in its books and records regarding its rate charges and allocation, providing this in a timely and complete manner, providing an explanation of its rate charges, providing samples of freight bills and other charges. You're addressing the freight data versus the sales data issue, right? Correct. But the record seems to show that they repeatedly supplied sales data when asked to give freight data. Is that an accurate characterization of the record? NTN allocated their freight charges by sales value because it does not keep weight, and therefore could not allocate by weight in their records. But when you were asked to supply freight data by weight, you didn't comply in a timely fashion. Is that correct? Well, we supplied the data, but it was allocated by sales value. That is correct, and not by weight. This was one of the alternatives offered to respondents by Congress. And NTN availed itself of this alternative because it does not have the records to allocate these expenses by weight. But you state one of the alternatives in this case. I mean, I understand in previous reviews the Congress Department allowed this information. But when you say this was another avenue available, what do you mean by that? The questionnaire requested respondents to allocate by one of the bases on which freight was incurred. Preferably, well, if one of those bases was freight or weight, then to use that. Or if none of these bases were available to a respondent, to use an alternative methodology. But they could ask you at least twice in the questionnaires, did they not, to demonstrate to them that your method was not distortive or there were any less distortive methods. And it seems to me that from what I could review in the record, your responses were quite conclusory and really not responsive to the details over which the Congress was questioning you. Am I wrong about that? You are correct that they asked the same question twice in the original questionnaire and supplemental to use an allocation and if there's an alternative to show that it wasn't distortive. And would you characterize your response to those as being very conclusory or as being very detailed and very responsive? We believe it was responsive because we provided all of the backup data to show that this was the only variable in common or that any of the shipments had in common. There is no allocation. There's unable, Montana's unable to allocate by weight because not all of the shipments, in fact many of them, are not charged by weight. And Congress itself believes that an allocation by weight in Montana's case would likely also cause distortions. We believe they concluded without an analysis that for some reason an allocation by weight is less distortive than an allocation by value. But isn't that your, I mean weren't you the ones that were supposed to explain to them that that's not true rather than them explaining to you what that is? Yes, Your Honor, that is correct. And we believe that we did by providing the backup data to show that a weight allocation would be distortive. There are many, many shipments in which weight is not a factor. So we felt that by proving this and by demonstrating this with the backup documentation, freight contracts, and other charges, that the sales value allocation, which is common to all shipments, would be the best method of allocation. And we, NTA provided all this information and it stood ready, willing, and able to have Congress verify this information. This was another explanation of why the value allocation would not be distortive. We believe that Congress could have come in and verified all of the records that NTA provided and proved that value was a reasonable allocation. We believe that NTA has exhibited the utmost cooperation to Congress in this, which is the 11th review of this order, as well as the preceding and succeeding reviews of this order. Freight information is only a small portion of the information that NTA provides to Congress in each review. In fact, NTA provides thousands, perhaps more likely hundreds of thousands, of pieces of data in each review. NTA spends many months of each year preparing the data and exhibits required for the questionnaire response. It begins its preparation well before Congress issues its questionnaire each year. This is necessary for NTA just to return the questionnaire response when the deadline is imposed by Congress. We request, therefore, we believe, therefore, that the imposition of an adverse inference was simply punitive. The hammer of the adverse inference could not have induced further cooperation. NTA simply does not keep these records and has no business reason to do so. So the adverse inference was a punitive measure in this case. NTA fully cooperated and acted to the best of its ability. We also believe that the application of facts available was unlawful. There was no evidence on the record that Congress should apply the facts available because the alternative allocation methodology, as Congress invited respondents to use, was used. We request that the Court reverse both the decision for facts available and the adverse inference. Thank you. Thank you, Mr. Donnell. Mr. Ellis. Good morning. Thank you. I'm recovering from bronchitis, so my voice is not very strong, it should be. This is another appeal involving the so-called zeroing issue from the WTO. I had the pleasure of referring to it by Judge Price a couple years ago. But this moment is clear because there's some confusion in the briefing from the other side. We are not re-arguing the court's case, the court's decision. We're well aware of this court's position on the implementation process. A lot of your brief talks about the need to wait until the WTO acts. Has the WTO now acted as of September 28th? Two things. What we're really seeking is waiting until the executive branch acts, which I'll get to. The status now at the moment is that the WTO panel has ruled against us. Yes, that's what I understood. The appellate body argument was held just before Thanksgiving. And the appellate body is issuing its decision in mid-January. What will happen then is that the executive branch will have to announce to the WTO in mid-February, at the next meeting, whether or not it will implement the decision, assuming, of course, it's an adverse decision. So all we're asking for here is truly pretty modest. We're just asking for a stay, in effect. And I know you denied our stay last May. But at the moment, we're just asking for a stay basically for ten weeks until mid-February, late February. If the executive decides they're not going to implement, we're not asking for this court to supervene somehow with a charming tattoo or anything like that. We acknowledge that, of course, decision, that's it. If the executive says that they are going to implement, then at that point, it would be suitable for being implemented. Implement what? Implement a decision. Adverse to you. Correct. No, no, adverse to the government, adverse to the Department of Commerce. But at this point, the decision has gone against you. Correct. So they'd have to reverse themselves at the appellate level and then uphold that at the executive level. Well, they would have to reverse that at the appellate body. Yes. And then the United States at the following disputes of the body meeting would have to concede. In fact, they'd have to announce that it would comply with the ruling of the appellate body. We're talking about years here, aren't we? No, no, not really. Well, again, a couple of things. In February, if they say they're going to comply and implement,  I don't understand. I'm not following your answer as to January or the time frame. Is there a set time frame in which the appellate body is going to act? Yes, January. January. January 15th. Do they hear it then or will they have a decision? Decision. They've already heard it. It's now in submission. The opinion's been written. And they will announce a decision January 15th is the schedule, the appellate body. So they could affirm, which means there's no reason for, obviously- You could stay until then and dismiss it then? Oh, but if somehow they reverse, does it then go to the government? Are there other levels of review? No. Okay. And then the government has a statutory time, there's a set time frame- The WTO has a time frame for which the United States would announce whether or not it would implement. And that's the next year. How do we know this will be implemented retroactively? I'm sorry? How do we know this will be implemented retroactively to cover your- We don't. And that's something for the executive to decide. So that's another- But that is something for you to remand, to let the department decide. If you do nothing now and simply affirm, the department, the executive branch will have no opportunity to retroact. But that would be your next shipment in, right? Well, but these shipments will have lost forever. That's- So, in effect, we will have overpaid duties. The goal, obviously- You would have paid duties according to what was due at the time, according to the law at the time that they were imported. But the laws are subject to review. And there is a method for- I mean, not laws, but administrative decisions are subject to review and revision. And it would seem that we should simply give the executive the chance to decide that. Now, they will say, in answer to your honest question, that they cannot implement retroactively. Yes, that's what they said in their brief. Right, but that is not correct with all due respect to my opposing counsel. At the WTO-  I'm sorry? You can't point to any provisions specifically that- The United States government- That they would be allowed to. There's nothing that prohibits it. And the United States government has said that Section 129, which talks about prospective implementation, is not the exclusive mechanism. They've said that to the WTO. They're saying the opposite to you. They can't- Both decisions cannot be right. They're saying inconsistent things. If they are right, that the statute, by saying prospective only, means that they can't- that they're prohibited- The statute does say prospective only. If the statute is the exclusive mechanism, then fine. Then once again, we're out of luck. But they are saying that that's not true. Because if it is true, they're going to run into trouble at the WTO. So they are saying the opposite thing across the water. Now, if there are alternative mechanisms, it's simply going to be appropriate for you to remand to them and let them use them. Or decide if they want to use them. Now, you haven't pointed to any- All I- All you said is they could. Well, all we did- That's correct. But I'm not saying they have to. I'm saying they could. You don't point to anything that allows it. No, that's correct. But they themselves- the executive branch, who should be getting some deference, I would think, in interpreting the statute, has stated that- if I can quote from their statement at the WTO- How do you interpret the word prospective? That's in the statute. Right. If the statute is the sole mechanism, then it is prospective only. And we would lose. But that would mean that no implementation would ever be done in administrative reviews. Which is the American system. Because reviews are always retrospective. The United States is aware of that. And so they have said that the statutory prospective only provision is not exclusive. Because if it were, they would run into serious trouble in the WTO. And the executive deserves some flexibility, at least for deference, in that interpretation. But here they're telling you the opposite. They're telling you, no, there's no retrospective. And what that means is that they will never be able to implement in any administrative review proceeding. Because reviews are always retrospective in nature. I'm sorry, I'm passing my time. Thank you, Mr. Ellis. Let's hear from the government. Ms. McCarthy. Good morning, I'm here for support. The kind of feature of the three issues presented for review today is that all have been presented to this court. None of them before. First of all, with regard to NTN's challenge to commerce's inclusion of export price sales in the calculation of CEP profit. I did not hear NTN's counsel today address that issue in detail at all. But this matter, commerce issued its policy decision in 1997. NTN raised the challenge to this interpretation in 1999 to the Court of National Trade. The Court of National Trade sustained commerce's determination in 2001. Post-decision with Senator Torrington. And this court affirmed that decision without opinion in 2003. With regard to NTN's challenges to commerce's application without the first facts available. NTN made a very similar challenge to this Court of National Trade. When National Trade upheld commerce's determination in NTN's post-decision 306S sub-second 319 in 2005. And this court in 2004. And this court affirmed without opinion in 2005. As NTN's counsel referenced, commerce repeatedly asked for information regarding weight. And NTN responded with the same boilerplate responses over and over again. Commerce understood that. Was this a somewhat unexpected shift in the way you requested the data to be supplied? Yes, this was the first review in which commerce did ask NTN multiple opportunities to provide weight-based data. This court, ironically, because of the time of litigation, previously that was a subsequent review in which NTN did challenge the fact that it had a lack of notice as to the change in methodology. The Court of National Trade rejected that argument. And as commerce explained its determination in this review, specifically to protect itself against its allegation of lack of notice, it repeatedly gave NTN time and time and time again. It explained to NTN why it wanted the weight data. And what it was looking for was the weight data itself so that commerce could decide precisely how distortive it was. And it had refused. What do you mean by the weight data itself? Well, NTN clearly had invoices. Well, commerce wanted to allocate freight expenses based upon weight because it thought that that would be less distortive than sales value. NTN represented that we can't do that because there are certain transactions that are not based. Was there something that was easy to get together, the weight data that you were requesting? Well, commerce was trying to get it. I mean, was it a matter of weighing the different items? Well, that's what commerce was trying to get at. Clearly, some of the transactions, as NTN conceded in its multiple questionnaire responses, were based on weight. NTN's point was simply weight was not the sole basis. Well, commerce wasn't looking for the perfect allocation basis. It was looking for the least distortive. They said they didn't have this information and they couldn't get it together easily. For certain of the transactions, it identically picked. Why couldn't you use the other information for those areas where they didn't have the data? Because it wasn't provided. Because that's what commerce was looking for. Commerce was looking for, give us the weight information. Yes, but if they didn't have the weight information and no easy way to get it, why couldn't you use the same information you had used in every earlier review, namely the sales data information? Because, as commerce explained in its determination, it believed that even an imperfect allocation based upon weight would be less distortive than an allocation based upon sales. Commerce was looking for the data. If NTN, as it explained in its determination… They didn't have the data. Well, they certainly had invoices because they were able to identify invoices in which weight wasn't used. Well, if they have those invoices, then why couldn't they turn over the invoices in which weight was allocated based on weight? Let commerce decide. Let commerce take a look. Commerce may have decided. I don't know. Commerce may have decided that NTN is correct. But the fact of the matter is they gave boilerplate responses and they never explained in detail why their methodology was less distortive. Moving on to commerce's treatment of non-dom sales, this was the case… We understand Coyote's argument that it is not challenging this court's precedent in taking an in-course, or could it? The Supreme Court declined to grant a petition for registration regarding this matter, and it settled as a matter of domestic law. At the time commerce issued the final determination, commerce's determination was lawful. It is lawful to this day. It's a matter of domestic law. Commerce's determination was important to the law, and it should be affirmed. There's no just reason for delay. There's no reason why a mandate should not issue affirming this lawful interpretation. As we quoted the statement of administrative action at the close of our brief, Congress understood that there would be an implementation process, that at some point the executive branch may be implementing an adverse WTO decision, and that that implementation would not necessarily render commerce's prior interpretation under domestic law unlawful. It specifically contemplated that there would be a position in which… The government does not consistently follow the mandate of the decisions being prospective only. The government does pick and choose, and does that really apply? In this court, the United States, represented by the Department of Justice, consistently maintains the position that the statute unambiguously provides for prospective only implementation. That is consistent with what we have quoted and stated. Why do you review everything retrospectively? It's a review of retrospective activity, right? But for the reviews… When a point goes to the WTO and challenges commerce's interpretation of the statute, and if it succeeds and the executive branch implements, then that implementation is prospective. It goes forward. NTN doesn't have any relief with regard to the entries at issue. Because the entries at issue that are subject to the final determination of commerce, in this case… We're talking about this statute. It says prospective only. That can't be accurate, can it? So you do retrospective reviews. It's prospective to whatever entries are not liquidated as of the time of the implementation. But we shouldn't delay. In other words, there shouldn't be a delay in liquidations that were at issue in this administrative review, that were subject to a lawful interpretation by the Department of Commerce. There is no reason to delay implementation simply because the law might change. That is a position that any litigant in any court in this country would take. Please stay my case because the law might change and it might make my frivolous case become less frivolous. That is simply not a basis to stay. The final determination of commerce was fully in accordance with the law. If you have any questions, I'd be happy to. Thank you, Madam Clerk and Mr. Press. May it please the Court. I would like to add a few things regarding the trade expansion issue. First of all, I want you to keep in mind that the task that the Commerce Department has supported in the Manny Duffy investigation is foremost to compare prices. Are you prepared to defend the Commerce's activities? Those don't really affect you very much, do they? You don't know what Commerce is, why they made their decisions, or anything? We have, throughout these reviews, oftentimes made comments that any allocation of freight expenses that is done by value is inherently distorted because it will move the freight expense to the higher priced sale. If you're looking at a dumped sale, an allocation by value will mean that on the home market side, the higher priced sale will have a higher reduction, so the home market price will come down. And the opposite effect will occur on the United States side. So, inherently, the value-based allocation is an allocation that is predisposed to benefit the respondent. But is that Commerce's decision? I mean, Commerce didn't take this case because they believe there's an inherent distortion or that there's a presumption that it's using sales data. No, I believe that that is inherent in Commerce's decision. It's a self-evident proposition that if you take an expense that is incurred on, say, based on distance or based on the contractor that you have, or based on weight, or based on whatever it is, if you allocate that instead of on distance or instead of on weight, if you allocate it based on value, then you have an allocation that's no longer neutral because you're looking at the values, you're looking at the prices in your comparison. So your allocation is no longer neutral. Now, it may be that Commerce hasn't done a great job in explaining what the distortion really consists of, but as you have said, it's not Commerce's job to prove that there is distortions. It's the job of MDN to demonstrate to Commerce that it has not, that its allocation method is neutral, and this it hasn't done. On the question of cooperation, I think the relevant facts are, for the court to note, are the fact that Commerce exactly anticipated this particular issue in their questionnaire. I mean, the questionnaire said, if you have a situation where your freight expenses are allocated in a number of different ways, I'm sorry, are incurred in a number of different ways, you know, weight or something else, then we prefer that you do your allocation on one of these factors, for example, weight, and obviously not value. And then they also asked the respondents to include a field in their electronic response that would list the weight for each bear. And if they had listed an estimated weight, would there have been an adverse inference based on maybe it was too high or too low? No, there would have been an allocation, but you have to also remember Commerce's recalculation. Remember, they didn't have this data. Right, and so they had to still allocate by value. Commerce's reallocation or recalculation is still by value, so that bias against the petitioner and for the respondent is still there, but they counteracted that by allocating more expenses to the main, to balance the inherent bias that is in the allocation and in the inherent.  So we see it as an issue of accuracy, and the department doing its best with the questions that we have laid out in great detail. They asked for all the data right from the get-go, and they repeated their questions in a supplemental questionnaire, and what they got back was exactly the same thing that they had before. It was slightly amplified, but they never got the fair amount, and they never got the weight added, and they never got the allocation. The demand at the end would have also, even if a complete adherence to what Commerce was proposing, they could have explained to Commerce, look, we can do it on these sales, we can't do it on these sales, we can do it on this channel and not on this channel. I mean, there's many alternatives that are possible there, but that were not proposed and not discussed at all by Commerce. Thank you, Mr. DePres. Contrary to what Mr. DePres says, Commerce made no such finding that a value-based allocation is inherently disordered in this review. To answer Judge Archer's question, providing this kind of weight data that Commerce has asked for is an enormous challenge. There are thousands and thousands of models. NTM is a large company. It makes many more bearing models than are the subject of this case. So this is, it is not a simple providing weight data. For whatever reason, companies in Japan who ship bearings do not charge NTM on the basis of the weight of the product. This is, it's not in their business records. They just don't need this for their business purposes. And I don't believe that there's a requirement in the dumping law that respondents change their recordkeeping simply to provide the information that Commerce requested. NTM did provide the information that it could. There is a reasonable allocation methodology in the record. Commerce believes that there is one that might be distortive, but maybe slightly less distortive. But we believe it did not provide supporting evidence for this on the record. Finally, I would just like to say, while it may seem like boilerplate language, boilerplate language, if true, is still true. There is nothing else NTM can say. They do not have this information in their business records. I just want to ask you briefly, because I know your time is going to run out. Who's got the burden here? I mean, doesn't, didn't NTM have the burden in the first instance to come in and show that it wasn't, that sales was less distortive, information on sales was less distortive than freight expenses, or come in and explain the hardship or the impossibility of a freight. I mean, you're putting the burden entirely here on customs to show what was more or less distortive. It seems to me, unless I'm missing something, that the burden was on you all in the first instance to make, to make that showing, not commerce. Am I wrong about that? No, you're correct. And we believe that we did show this by providing all the information by an extensive narrative response explaining how the freight charges are incurred. There are many, many shipments, many that are not, have no, weight is not a factor at all in the charge. So we believe that we showed by documentation, by all of these documents that were available for verification, that this is the least distortive, most reasonable method for NTM to use in this instance. Thank you. Thank you. Mr. McDonald. Mr. Reynolds, we'll give you one minute. You can spend most of your time. Okay. I just want to point out again, we're only requesting a short stay. Only two things have to happen. The Peloponnese decision in February, the executive branch decision, whether to implement it or not. She says quite accurately that any litigant could come and say the law may change in the future. Why wouldn't we just implement the law as it exists at this moment? It's not that the law may change. It's that the executive branch is about to remove it. They get an idea that it should change its policy. It's not the law generally. It's the determination in this very proceeding. It's as if you had two parallel proceedings in two courts on the same arrest. Sometimes you would have one that states the outcome of the other. They happen to be the WTO is not a self-enforcing part of the United States legal system. So we have to go through you. We have to go through the courts because administrative reviews are always completed before the WTO gets to the point. Just one more thing before you go. They still, to this day, have not explained the inconsistency between the two positions here at the WTO. They've said to the WTO that the 129 perspective only is not exclusive. And that there is a mechanism, a plaintiff of a mechanism, of implementing adverse decisions by remands and going back to the agency to do something compliant. All we're asking for is that you send it back to the agency and let them decide if they want to do that. If you don't, you're going to guarantee a violation of the WTO by the United States, which isn't appropriate. It's not just may let the executive apply. You're going to guarantee it. And you're also going to make sure that in the future administrative reviews, we can't get compliance. This situation will always arise. Thank you.